ALOIS M. SONNLEITNER and MILDRED A. SONNLEITNER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sonnleitner v. Commissioner
Docket No. 3671-74.
United States Tax Court
T.C. Memo 1976-249; 1976 Tax Ct. Memo LEXIS 154; 35 T.C.M. (CCH) 1083; T.C.M. (RIA) 760249; August 11, 1976, Filed Frank E. Magee and Thomas S. Moore, for the petitioners. Jan R. Pierce, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined the following deficiencies in petitioners' Federal income tax: Year
Deficiency
1968
$ 3,441.51
1969
13,846.72
1970
3,587.84
Concessions having been made, the sole issue before us is whether amounts received by petitioners during the years in issue were in consideration for a covenant not to compete and, therefore, taxable as ordinary income. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners' Federal income tax returns for 1968, 1969 and 1970 were prepared and filed on the cash receipts and disbursements method with the Internal *155 Revenue Service in Ogden, Utah. Petitioners resided in Longview, Texas, at the time their petition herein was filed. In the early 1950's petitioner Alois M. Sonnleitner (petitioner) and Cloyce W. Smith (Smith) worked for the Swanson Cookie Company in the midwest. In 1954 they acquired a Swanson Cookie Company franchise covering the States of Washington and Oregon. [1] Petitioner and Smith operated the business (hereinafter the Oregon Company) as a partnership in which each owned a 50-percent interest. From the beginning, the Oregon Company was extremely successful. On November 5, 1956, the partnership was incorporated with petitioner and Smith each becoming directors and 50-percent shareholders. Because Oregon State law at that time required corporations to have three directors, Rolland R. Mains, the Oregon Company's accountant, was selected to be the third director. Smith was the president of the new corporation and petitioner was the secretary-treasurer. All of the predecessor partnership's assets, including the franchise agreement with Swanson, were transferred to and accepted by the corporation *156 in exchange for all of its capital stock. On November 5, 1956, petitioner and Smith entered into an agreement which provided, in part, that if either party desired to sell, transfer or encumber his stock in the Oregon Company the other party would have the option of purchasing such stock for, inter alia, three times the stock's book value. In conducting their business operations, petitioner was in charge of sales and promotion while Smith took care of the actual operation of the bakery. Petitioner was primarily responsible for the success of the business and, as head of sales, he was much better acquainted with the customers than was Smith. In January 1962, petitioner acquired a Swanson franchise covering the States of Oklahoma, Texas, and Louisiana. As time went on, petitioner became more involved with his Texas franchise and less with the Oregon Company. During 1966, petitioner spent approximately 20 weeks of the year pursuing his business interests in Texas and Oklahoma. Also, petitioner charged a number of travel and phone expenses to the Oregon Company which he had incurred in connection with operating his Texas franchise. Because Smith felt that petitioner *157 was devoting an excessive amount of time to his Texas company their relationship had become quite strained by the middle 1960's. In late 1966, Smith contacted an attorney concerning this conflict with petitioner. In May 1967, petitioner again traveled to Texas but, before he left, Smith warned him that when he returned he would no longer have a job. On June 13, 1967, after petitioner had still not returned from Texas, the remaining members of the board of directors of the Oregon Company (Smith and Mains) voted to remove petitioner as an officer and employee of the company. At some later date, another board meeting was held, at which petitioner was present, and the directors again voted to terminate petitioner's employment, the vote being two to one. Meanwhile, petitioner's Texas company was in poor financial shape and, by the close of 1966, was behind in the payment of many of its bills. The Texas plant was obsolete, consequently petitioner had a new plant constructed but, in January 1967, just prior to its completion, it was destroyed by an explosion. The failure of the Texas company to pay its bills currently continued through 1968. Both Smith and Mains were aware that *158 petitioner was having financial troubles with respect to the Texas franchise. After petitioner's employment with the Oregon Company was terminated, petitioner and Smith filed various lawsuits against each other. In settlement of these lawsuits and to effect sale of petitioner's interests, on November 22, 1968, petitioner, Smith and the Oregon Company entered into a purchase agreement (hereinafter the Agreement), which provided in part as follows: 1. Settlement of Salary Dispute and Mutual Releases. At closing, the corporation will pay to Sonnleitner, the sum of Ten Thousand Dollars ($10,000) in cash for his salary for the period from June 16, 1967, to the time of closing, and the parties will cause both of the above-described proceedings to be dismissed with prejudice and without cost to any of the parties. Smith, Sonnleitner, and the corporation, hereby mutually release one another from all claims of any sort or description whether arising out of the lawsuits or otherwise. 2. Purchase. On closing, Sonnleitner will sell to the corporation and the corporation will buy from Sonnleitner 500 shares of the corporation's issued and outstanding capital stock at a price *159 and on the terms and conditions as hereinafter set forth. 3. Valuation of Corporation. Contemporaneously with the execution of this agreement, Smith and Sonnleitner have employed appraisers in accordance with the terms and conditions of that certain letter form of appraisal agreement of even date herewith, a copy of which is marked Exhibit "A", attached hereto and by this reference made a part hereof. The parties agree that the determination of the appraisers of the value of the business as set forth in the certificate of value to be furnished by the appraisers shall be final and binding on each of them. 4. Purchase Price. The purchase price for the shares of stock agreed to be sold by Sonnleitner to the corporation shall be a sum which is equal to one-half of the value of the corporation as set forth on the appraiser's certificate of value, minus $75,000. * * *
6. Covenant Not to Compete. In consideration of the sum of $75,000 to be paid by the corporation to Sonnleitner, Sonnleitner covenants and agrees that he will not compete directly or indirectly, either as a proprietor, partner, shareholder or a corporate officer, director or employee against the *160 business of the corporation within its present territory consisting of the State of Oregon, Washington and Alaska at any time before January 1, 1973. Fifteen Thousand Dollars ($15,000) shall be paid by certified check at the date of closing. The balance of Sixty Thousand Dollars (60,000) shall be evidenced by the corporation's promissory note in the principal sum of Sixty Thousand Dollars ($60,000), payable in eight semi-annual installments of $7,500 each, with the installments to be payable on the 15th day of June and on the 15th day of December of each of the years 1969, 1970, 1971 and 1972. Smith and petitioner commissioned three appraisers to make the necessary valuation of the Oregon Company, and both parties were satisfied with the appraisers selected. Petitioner was represented by counsel throughout all stages of negotiation and execution of the Agreement. Petitioner's attorney was aware of the tax consequences of the covenant not to compete and, although he was not happy with the inclusion of the covenant, he felt that it was necessary to achieve a settlement. Both prior and subsequent to the execution of the Agreement, petitioner had threatened to compete with the *161 Oregon Company, but did not actually do so during the term of the covenant and received all amounts due under the Agreement. Under the terms of the Agreement, petitioner received the $75,000 for his covenant not to compete in installment payments as agreed. On his 1968, 1969 and 1970 returns, he did not report such payments as ordinary income in consideration for his covenant not to compete but rather as capital gains representing additional amounts received for the sale of his stock. OPINION The sole issue before us is whether the $15,000 amounts received by petitioner during the years at issue were in consideration of his covenant not to compete or were simply additional amounts received for the sale of his stock. If such amounts fall into the former category they are taxed at ordinary rates, , affd. sub. nom. , while if they fall into the latter classification they are afforded capital gains treatment. Secs. 1202, 1221. [2]
Petitioner argues that, for tax purposes, he should not be held to the assigned value of the covenant not to compete *162 in the Agreement for two reasons: (1) He signed the Agreement under duress; and (2) From an economic and practical standpoint, he was unable to compete with the Oregon Company and his covenant was therefore without any economic reality. Respondent disputes petitioner's claim of duress and argues that there were indeed practical and economic motivations behind the covenant and that petitioner should accordingly be bound by the value thereof specified in the Agreement. We agree with and hold for respondent. In numerous cases this Court has been faced with the situation where one party to a contract attempts to show that a different value should be attached to a covenant not to compete than that value specified in the contract. In these cases, we follow what is known as the "strong-proof" doctrine, best explained in , affg. at 308: * * * when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned *163 value, strong proof must be adduced by them in order to overcome that declaration. The tax avoidance desires of the buyer and seller in such a situation are ordinarily antithetical, forcing them, in most cases, to agree upon a treatment which reflects the parties' true intent with reference to the covenants, and the true value of them in money. Another standard, adopted by the Third Circuit in , but rejected by this Court in , imposes the requirement that the party to the agreement may not successfully attack the specified value in the contract absent "proof which in an action between the parties to the agreement would be admissible to * * * show its unenforceability because of mistake, undue influence, fraud, duress, etc." . The Fifth Circuit, to which the instant case is appealable, has in the past followed the "strong-proof" doctrine. ; . Recently, *164 however, that court has expressed some reservations as to whether it will continue to follow this doctrine or instead adopt the so-called Danielson rule. See . We see no reason to follow the Danielson rule in the Fifth Circuit before that Circuit itself expressly decides to adopt it. However, as respondent points out, by basing his case in large part on a claim of duress, petitioner has placed himself within the scope of this more stringent standard. Petitioner alleges that he was forced to sign the Agreement because of "economic duress" resulting from Smith's alleged plot to discontinue petitioner's salary at a time that he needed funds to sustain his financially failing Texas franchise and thereby forcing him to sell his stock in the Oregon Company at an unrealistically low price. In determining whether a contract is unenforceable because of duress, Oregon follows what is commonly called the modern or equitable rule as expressed in 17 C.J.S., Contracts, sec. 177 p. 965. . *165 Under this modern rule, economic duress can vitiate a contract, but to do so must be based on the conduct of the opposite party and not on the necessities of the purported victim. Moreover, the alleged duress must not be the result of mere business pressure, financial embarrassment, or economic necessity. 17 C.J.S., Contracts, supra at 966. Applying this standard, we are unable to conclude that petitioner entered into the Agreement, including his covenant not to compete, under any economic duress. We think Smith had ample reason to discontinue petitioner's employment with the Oregon Company. Petitioner was spending a great deal of time tending to his Texas franchise and, from Smith's point of view, petitioner was not earning the salary he was being paid. Additionally, petitioner was charging numerous business expenses to the Oregon Company which he had incurred in connection with his Texas franchise. We see no sinister plot on Smith's part in this matter; rather, his actions seemed to us to reflect prudent business sense. It is true, as petitioner contends, that the price agreed upon for his 50-percent interest was probably less than if the parties had followed the purchase *166 formula set forth in their November 5, 1965, contract, but that contract was purely a "first refusal" type of agreement which granted an option to the party not wishing to sell. Smith was never bound to exercise this option, and the parties were perfectly free to employ a different valuation method. The fact that Smith agreed to abide by the decision of three independent appraisers convinces us that he was not setting an unrealistically low price and forcing petitioner to accept it. Petitioner was indeed in a poor financial situation during the negotiations of the Agreement, and he no doubt was in great need of the money for his stock. Precise economic and financial equality between the parties, however, is not a prerequisite for a valid and enforceable contract. Petitioner may have been bargaining from weakness but he has not shown the requisite wrongful, unlawful or unconscionable conduct on Smith's part necessary to prove economic duress. The record likewise does not support petitioner's claims that his covenant not to compete was without any business and economic reality. He was an active businssman who was much better acquainted than Smith with the Oregon Company's *167 customers. In fact, he was the prime reason the company had been so successful and, given his repeated threats to compete with Smith both before and after the Agreement was executed, we think Smith wisely sought the inclusion of the covenant in the Agreement. Petitioner contends that his precarious financial situation, which was well known to Smith, and the fact that his Texas franchise agreement prohibited him from operating outside the southwest area, combined to make his covenant not to compete economically meaningless. Petitioner's argument is based upon what we think is an erroneous assumption, namely that during the four years following the execution of the Agreement, he was inextricably bound to continue to operate his Texas franchise. There is abolutely no reason why petitioner could not have sold his Texas business, combined the sales proceeds with the money he received from the sale of his stock, and set up a competing business in Oregon. Petitioner's close relationship with the Oregon Company's customers and his threats to compete with Smith are evidence that this was indeed a possible scenario against which Smith properly protected himself. Decision will be entered *168 under Rule 155.
Footnotes
1. On July 2, 1962, Swanson Cookie Company became Archway Cookies, Inc.↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.↩